LANDRY, Judge.
This case arises out of a collision between an automobile owned and being driven by-plaintiff Matthew Scott (appellee) and a. truck or van belonging to the American-Red Cross and being operated by a volunteer *155 worker, Floyd W. Newman. Suit was instituted solely against The Travelers Insurance Company, insurer of the Red Cross truck (appellant), which said defendant has taken this appeal from the judgment of the trial court awarding plaintiff recovery for property damage, lost earnings and personal injury. We find that the trial court has properly resolved the purely factual situation herein presented for determination. We conclude, however, the award for property damages must be reduced as hereinafter indicated.
For a cause of action plaintiff alleges in substance he was driving southerly along Scenic Highway (a four lane paved thoroughfare in the City of Baton Rouge, East Baton Rouge Parish), in his 1958 Oldsmobile at approximately 2:25 P.M., October 4, 1964 (the day following the notorious Hurricane Hilda). Plaintiff further avers he was proceeding in the left or inside southbound lane when the truck or van operated by Newman negligently swerved from the right or outside southbound lane in front of petitioner’s vehicle in an attempt to make a U-turn through a gap or break in the neutral ground of the highway to reverse the truck’s direction of travel. Next petitioner states that, despite his attempt to avert a collision by forcibly applying his brakes, the highway being wet because of recently fallen rain, he was unable to stop before striking the rear of the truck which had invaded his lane of travel.
Appellant denies its assured, Newman, was negligent in any manner whatsoever. Defendant contends the truck was proceeding southerly in the left or inside southbound lane with its turn signal indicating its intended left turn when said vehicle was negligently struck from the rear by plaintiff’s automobile. Appellant also asserts the accident resulted solely from the •negligence of plaintiff in (1) driving at -an excessive rate of speed; (2) following too close; (3) not keeping a proper lookout, and (4) failing to stop in time to avoid striking the left turning truck traveling in its proper lane. Alternatively, defendant maintains plaintiff was contribu-torily negligent in the respects above mentioned.
The trial court found the accident resulted from Newman’s negligence in swerving from the outside into the inside lane in the course of attempting a U-turn. Appellant maintains the trial court erred in concluding Newman’s negligence to be the sole proximate cause of the accident and, alternatively, failing to find plaintiff guilty of contributory negligence barring plaintiff’s recovery. In the further alternative appellant contends plaintiff failed to establish alleged lost earnings and damages to his vehicle with that degree of certainty required by law. Plaintiff has answered the appeal requesting an increase in the award allotted him for personal injuries.
In essence plaintiff testified he was proceeding southerly in the inside lane of Scenic Highway at a lawful rate of speed. He first observed the truck in the outside lane as said vehicle suddenly veered to its left into the inside lane at which time the truck was approximately 80 feet ahead of plaintiff’s automobile. Plaintiff immediately applied his brakes full force but the pavement being wet, his automobile slid into the rear of the truck, the front of plaintiff’s car striking the left rear of the Red Cross van. According to plaintiff, at the moment of impact the truck was crossways in the highway traveling in a southeasterly direction.
On the other hand, Newman, a salesman from Vicksburg, Mississippi, acting as a volunteer worker for the American Red Cross following the aforementioned natural disaster, testified he was traveling in the inside lane of Scenic Highway. He intended to proceed westerly to Lafayette, Louisiana, via Highway 71-190 by turning right onto 71-190 which intersects Scenic Highway, but missed his turn two or three blocks to the north. Realizing his error, he stopped at the Harbor Service Station, situated on the west side of Scenic Highway *156 at the intersection of Mason Street approximately 150-200 yards south of his con-, templated turn, and there sought direction to his destination. After receiving the necessary route information, he filled the tanks on his vehicle with fresh drinking water intended for use by the hurricane victims in the Lafayette area and resumed his journey. Following the instructions of the station attendant, he proceeded onto Scenic Highway and drove immediately across the outside lane into the left lane preparatory to making a U-turn at the first break or gap in the neutral ground to proceed northerly to his proposed turn-off. Newman estimated the break, through which he was attempting to turn, was situated approximately 100 yards from the • gas station he had just left. Fie testified he had his turn indicator in operation signal-ling his proposed left turn and was traveling at approximately 5 to 8 miles per hour when his vehicle was struck in the left rear by plaintiff’s automobile.
The accident was investigated by Officer Earl Williams who testified he arrived upon the scene about 20 minutes following the collision and before either vehicle was moved. He found the truck in the inside lane of Scenic Highway partially in the break or opening in the neutral ground and plaintiff’s vehicle behind the truck, also in the left lane of travel. Williams noted the truck was damaged on its left rear corner and plaintiff’s automobile along its entire front, especially in the center. Measurements taken revealed the point of impact occurred twelve feet north of the north parallel of Harold Street (which intersects Scenic Highway at the point where Newman was attempting his U-turn), seven feet west of the western edge of the neutral ground of Scenic Highway and 14 feet east of the western edge of the paved surface of the westbound traffic lanes of Scenic Highway. Officer Williams also noted the truck was entirely in the left lane for southbound traffic on Scenic Highway. It was not, however, parallel to the roadway of Scenic Highway but was angled to the opening in the neutral ground and facing in a southeasterly direction.
According to Williams, it was raining at the time, so much so that he interrogated the witnesses in his patrol car. His testimony in this regard is corroborated by Newman but contradicted by plaintiff who stated that whereas it had been raining prior to the accident and the roadway was wet, it was not raining either when the collision occurred or the officer arrived. Williams testified further that Newman told him he, Newman, was lost prior to the accident and wanted to turn to make his way back to Airline Highway (71-190), and changed from the outside to the inside lane one or one and one-half blocks north of the site of the accident. Newman also related he arrived at the opening in the inside lane and was struck from behind after having pulled partially into the break and stopped to await the passage of northbound traffic.
Officer Williams recalled plaintiff’s version of the accident to be that the truck was traveling south on Scenic Highway in the right hand lane and made an abrupt turn across the path of plaintiff’s vehicle traveling in the left lane. No evidence of skid marks was found by the officer.
Plaintiff’s witness, Eugene Chaisson, an. acquaintance of plaintiff, employee of a used car dealer situated on the east side of Scenic Highway a short distance north' of the point where the accident occurred,, testified he was attracted to the accident by the sound of squealing brakes and looked up in time to see the collision. This witness’s testimony adds little of probative-value as he did not see either vehicle prior to the collision and conceded he did not seethe truck maneuver from one lane to another. Fie only surmised he was unable to explain how the accident occurred except that the truck veered from the outside lane across the path of plaintiff’s automobile.
Another “eye witness”, Walter Richardson, also an acquaintance of plaintiff, was driving his automobile northerly along *157 Scenic Highway and stopped in obedience to a traffic signal situated at the intersection of Scenic Highway and Shada Lane, one block south of the scene of the accident. He stated he was facing the truck and car and observed the former turn from the right lane into the path of plaintiff’s automobile.
Considering first the question of Newman’s alleged negligence, his own testimony indicates he left the service station premises and attempted a U-turn at the first break in the neutral ground on Scenic Highway, the exact distance involved being not made entirely clear by the evidence. While Newman testified he entered the left lane approximately 100 yards north of the point of collision, Scott, who lived in the area and was familiar with the locality, placed the Harbor Service Station not more than one-half block north of the accident site. We believe the evidence preponderates in favor of plaintiff’s estimation of the distance concerned. Accordingly, we find that Newman had little time and distance to leave the service station premises and attain the inside lane to make his U-turn without impeding or crossing the path of southbound motorists. We conclude, therefore, as did the trial court that, upon leaving the gas station, Newman angled sharply, almost in a straight line across the outside lane of the highway into and partially across the inside lane and was in the act of turning when struck from the rear by plaintiff’s vehicle. Counsel for appellant places considerable stress upon the point of contact as established by the testimony of Officer Williams and contends this physical finding corroborates Newman’s version of the accident and renders plaintiff’s account impossible. With this argument we disagree. We find the point of impact and nature of resulting damages consistent with either or both explanations offered.
Much emphasis is placed by counsel for appellant upon certain testimony of plaintiff to the effect that the “truck came from nowhere and cut across his path” and that plaintiff did not see the truck until it started to swerve from the outside to the inside lane. On this basis it is argued that plaintiff was negligent in not keeping a proper lookout. We note, however, that in substance plaintiff testified he was first attracted to the truck and became aware that it would affect his driving when he noted the vehicle about 80 feet ahead in the outside lane and saw it suddenly veer to its left across his path. A fair analysis of plaintiff’s testimony in its entirety is that he was not concerned with the truck until it made its sudden, unexpected move across his path. It would appear that plaintiff was indeed keeping a proper lookout and reacted to the emergency immediately upon its occurrence, unfortunately, plaintiff was unable to avoid the collision. We conclude, therefore, the accident in question was not a rear end collision case as contended by appellant but rather resulted when the truck attempted a sudden U-turn from the outside lane of the highway.
That Newman was guilty of actionable negligence under the circumstances we believe to be clear. Our statutes provide that no person shall turn a vehicle at an intersection unless the vehicle is in proper position upon the roadway as required in LSA-R.S. 32:101, or otherwise turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety. See LSA-R.S. 32:104.
In addition, our jurisprudence holds that before a motorist may change from one lane to another he must first ascertain the maneuver can be accomplished without endangering either following or approaching traffic. Williams v. Lafauci, L'a.App., 166 So.2d 42.
Alluding to plaintiff’s alleged contributory negligence, as previously stated, the investigating officer found no skid marks. However, as hereinbefore noted, the highway was wet at the time of the accident. While the testimony of plaintiff’s *158 and defendant’s witnesses is conflicting on the question whether it was raining at the time of the accident, we believe that in all probability it was raining lightly when the collision occurred and increased in intensity by the time the investigating officer arrived. Otherwise there would have been no occasion for him to interrogate the witnesses in his patrol car as he testified. This contradiction is of little moment, however, considering all parties admit the street was wet at the time of the accident which condition would unquestionably affect the ability of a vehicle to leave skid marks and also the duration of skid marks if made-. We find that plaintiff did apply his brakes but was nevertheless unable to avoid the collision. We likewise find plaintiff free of negligence proximately causing the accident.
The trial court allowed plaintiff the sum of $820.00 for the total destruction of his automobile which plaintiff purchased from a used car dealer some five months prior to the accident for the sum of $500.00. Plaintiff testified that following his acquisition of the vehicle he equipped it with a set of new tires, repaired its transmission and had the car painted. He did not, however, testify or otherwise establish the cost of these repairs and improvements to the vehicle.
To establish the value of the automobile plaintiff called three witnesses, namely, James F. Thompson, Tom W. Dupuy and Joseph Ortego, Jr., all of whom were qualified to value the vehicle.
Thompson valued the vehicle at the sum of $500.00 prior to the accident. He felt it was totally demolished in the accident and possessed a salvage value of $75.00. He was of the farther opinion the fact that the vehicle might have been recently painted would not affect its value.
Dupuy testified the car was worth approximately $950.00 before the collision. He also deemed' the automobile a total loss and established its salvage value at between $75.00 and $100.00.
Ortego deposed he sold the car to plaintiff in May, 1964, for $500.00 which was its retail value at the time of sale. Nevertheless he appraised the vehicle at the sum of $975.00 following the accident based on the repairs and improvements reputedly made by plaintiff. He likewise felt the automobile was a total loss and that its salvage value was approximately $75.00.
In assessing the value of plaintiff’s automobile at $895.00, we believe our colleague below fell into error. It is to be noted the vehicle was at least six years old when purchased by plaintiff for the sum of $500.00 a short time before the accident. According to one witness, the vehicle had been driven approximately 80,000 miles. Ortego admitted the transmission was defective at the time of sale. In addition it appears there was some damage to the rear and left side of the automobile which antedated and was in no way connected with the accident in question. None of the experts could tell precisely which damage resulted from the collision alone. Moreover, plaintiff made no attempt to establish the amount allegedly spent in repairing and improving the vehicle. Under the circumstances, we find Thompson’s valuation of $500.00 the most credible and award plaintiff said amount for his vehicle less the salvage value of $75.00 shown and therefore reduce the award of the trial court on this item from $820.00 to the sum of $425.00.
To establish his claim for personal injuries plaintiff called Dr. Frank G. Rei-ger, General Practitioner, who had been plaintiff’s physician for several years. Dr. Reiger saw plaintiff on the day of the accident and found plaintiff to be suffering muscle spasm in the neck and back. Plaintiff also appeared considerably nervous and tense and complained of soreness in the chest and both knees. Plaintiff’s condition was diagnosed as muscle injury to the neck and back and moderately severe contusions *159 of both knees. Four days later, on August 8, 1964, Dr. Reiger again saw plaintiff and found that whereas his neck and back injury were somewhat improved, plaintiff was experiencing fluid on one knee accompanied by swelling and soreness. Dr. Reiger prescribed muscle relaxants, diathermy, ultrasonic treatments and some whirlpool baths to alleviate the condition of plaintiff’s knees. Although Dr. Reiger found plaintiff sustained “a pretty good blow to both knees”, he did not find it necessary to aspirate the knee containing fluid. For some time following the accident, Dr. Reiger noted plaintiff’s neck and back to be very stiff and tense, which condition gradually improved. Plaintiff was seen approximately 15 times from the date of the accident until December 18, 1964, on which occasion plaintiff was discharged although Dr. Reiger was of the opinion plaintiff would suffer some further discomfort. Plaintiff had been under treatment by Dr. Reiger for a number of years for “nervousness” and the record leaves no doubt but that this condition was aggravated slightly by the injuries plaintiff received. In addition Dr. Reiger’s testimony establishes plaintiff’s incapacity to work from the date of the accident until December 18, 1964, a period of approximately 10 weeks.
Plaintiff has cited numerous cases respecting knee, neck and back injuries on which he predicates his claim for an increase in the award for personal injuries. We have carefully considered the quoted decisions and find that in each instance the circumstances are different from those in the case at bar. The trial court expressed the view the sum of $1,500.00 would amply compensate plaintiff for the personal injuries sustained. In this conclusion we readily concur.
While appellant contends the allowance of $300.00 for lost wages is excessive, we find, however, it is fully supported by the evidence.
The record establishes beyond doubt that prior to the accident plaintiff was employed as handyman or yardman by various individuals who utilized his services regularly one or two days each week. For such services he received either $1.00 or $1.25 hourly depending upon the particular employer and thusly earned an average of $30.00 weekly. It is undisputed plaintiff was unable to resume work for 10 weeks following his injury. We observe that following the advent of Hurricane Hilda, plaintiff would undoubtedly have had considerable demand for his services.
The trial court properly allowed special damages in the sum of $177.50, making a total award of $2,797.50. Since the amount allotted for plaintiff’s automobile must be reduced by the sum of $395.00, the judgment of the trial court is hereby amended in that the total award to plaintiff is decreased to the sum of $2,402.50. Costs of this appeal to be paid by appellant.
Amended and affirmed.